**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0150n.06

No. 16-5458

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 07, 2017
DEBORAH S. HUNT, Clerk

SERGE ADAMOV,                                    )
                                                 )
        **Plaintiff- Appellant,**               )
                                                 )
v.                                               )
                                                 )     ON APPEAL FROM THE
U.S. BANK NATIONAL ASSOCIATION,                  )     UNITED STATES DISTRICT
                                                 )     COURT FOR THE WESTERN
        **Defendant-Appellee,**                 )     DISTRICT OF KENTUCKY
                                                 )
and                                              )
                                                 )     **OPINION**
RICK HARTNACK and STEVEN                         )
SALOUTOS,                                        )
                                                 )
        **Defendants.**                         )
                                                 )

Before:  KEITH, MOORE, and ROGERS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  This Title VII case concerns the oft-litigated issues of whether an employee has established a causal nexus between a protected activity and an adverse employment action and whether the reasons for that action are unlawful pretext.  The employee in this instance, Plaintiff-Appellant Serge Adamov, claims that he was terminated in retaliation for complaining of national-origin discrimination.  Adamov found himself on the losing side of a motion for summary judgment on the issue of causation.  But for the reasons that follow, we hold that the less-than-one-month temporal proximity between his protected activity and the adverse employment action coupled with Defendant-Appellee U.S.

Bank National Association's ("U.S. Bank") increased scrutiny of him create an inference of causation and pretext. Therefore, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

Because this is an appeal of a summary-judgment ruling, the following facts are cast in the light most favorable to Adamov, the nonmoving party. *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (en banc). Several years after emigrating from Azerbaijan, Adamov accepted an assistant-manager position at a U.S. Bank branch in Louisville, Kentucky. R. 50 (Adamov Dep. at 13, 16, 17) (Page ID #443, 446, 447). His initial experience with the bank was positive; Adamov was promoted to a district-manager position and received several awards for his performance. *See id.* at 9, 22–23 (Page ID #439, 452–53); R. 48 (Hartnack Dep. at 14) (Page ID #413). However, as we observed in our previous treatment of this case, Adamov's rise through the ranks was not without incident. *See Adamov v. U.S. Bank Nat'l Ass'n*, 726 F.3d 851, 852 (6th Cir. 2013). Adamov came to believe that Richard C. Hartnack, the vice-chairman of consumer banking at U.S. Bank, R. 48 (Hartnack Dep. at 6, 8) (Page ID #405, 407), failed to promote him because of his national origin. R. 50 (Adamov Dep. at 46) (Page ID #476).

So, Adamov complained. He first complained sometime between February and April 2009 to Arlene Mockapetris, a regional manager at U.S. Bank. *Id.* at 48 (Page ID #478); R. 52

(Mockapetris Dep. at 8) (Page ID #622).[1] Adamov claims that during their two-hour conversation, Mockapetris agreed that Adamov "was not promoted because Hartnack did not like [his] national origin or the way [he] talked" and told him that she would speak with Hartnack. R. 44-2 (Adamov Aff. ¶ 14) (Page ID #318); R. 50 (Adamov Dep. at 46–47) (Page ID #476–77). Following this promised conversation, Mockapetris relayed Hartnack's explanation back to Adamov.[2] R. 44-2 (Adamov Aff. ¶ 16) (Page ID #319); R. 50 (Adamov Dep. at 47) (Page ID #477). Although Hartnack's precise explanation is unclear, Adamov considered it "absurd." R. 50 (Adamov Dep. at 47) (Page ID #477). Mockapetris, by contrast, came to believe that Hartnack did not in fact discriminate against Adamov. *Id.* at 48–49 (Page ID #478–79).

Meanwhile, on June 25, 2009, U.S. Bank "undertook a specific review of Adamov's business or personal financial transactions for security or any other purpose[]." R. 108-1 (1st Def. Interrogs. at 5–6) (Page ID #1064–65). Hits from this "computer-generated sweep" prompted Patti C. Burk, vice president of corporate compliance in the corporate security department of U.S. Bank, to investigate further, R. 41-2 (Burk Decl. ¶ 3) (Page ID #278), even though U.S. Bank had approved similar activity by Adamov in the past, R. 50 (Adamov Dep. at 50) (Page ID #480); R. 108-1 (1st Def. Interrogs. at 6) (Page ID #1065). As part of this investigation, the corporate security department discovered a $10,000 loan that Adamov made to a college friend in the United Arab Emirates in 2007. R. 41-2 (Burk Decl. ¶ 5) (Page ID #278);

---

[1]Mockapetris claims that this conversation happened "somewhere in 2008." R. 52 (Mockapetris Dep. at 28) (Page ID #642).

[2]Mockapetris denies that this conversation took place. R. 52 (Mockapetris Decl. at 17) (Page ID #631).

R. 46 (Saloutos Dep. at 37) (Page ID #359); R. 50 (Adamov Dep. at 52–54) (Page ID #482–84). A team of investigators, including Burk, met with Adamov on July 30, 2009, to discuss this and other wire transfers connected to Adamov. R. 41-2 (Burk Decl. ¶ 6) (Page ID #278); R. 44-2 (July 30, 2009 Meeting Notes) (Page ID #312); R. 50 (Adamov Dep. at 49–60) (Page ID #479–90). Adamov, believing "that the investigation was really not about [his] wires," but rather a witch hunt prompted by Hartnack, told the investigators that the investigation was motivated by his "national origins." R. 50 (Adamov Dep. at 51, 61–62) (Page ID #481, 491–92); R. 44-2 (July 30, 2009 Meeting Notes) (Page ID #312).

Two weeks after the interview, on August 13, 2009, U.S. Bank Chief Security Officer John B. Wellborn sent an e-mail to Burk entitled "Smoking Gun." R. 50-1 (Smoking Gun E-mail) (Page ID #575). The e-mail consisted entirely of an excerpt from the 2008 version of U.S. Bank's Code of Ethics and Business Conduct:

> **10. Exercise Prudent Judgment in Financial Transactions**
>
> **Financial Responsibility**
> U.S. Bank employees' personal financial matters should be handled with prudence at all times. Employee privileges carry the responsibility of prudent use of U.S. Bank products and services, which includes prompt payment for such services (where applicable). **In addition, employees and their families are prohibited** from borrowing money from **(or lending money to) customers** (other than financial institutions), suppliers, other employees, or independent contractors.

*Id.*; *see also* R. 41-2 (2008 Policy at 30) (Page ID #286) (The bolded text in the e-mail is not bolded in the policy.). The 2006 version of U.S. Bank's Code of Ethics and Business Conduct contained a similar paragraph, but it did not prohibit lending money to customers:

### 10. EXERCISE PRUDENT JUDGMENT IN FINANCIAL TRANSACTIONS

**Financial Responsibility**
U.S. Bank employees' personal financial matters should be handled with prudence at all times. Employees and their families are prohibited from borrowing from customers (other than financial institutions), suppliers, other employees or contingent workers.

R. 108-4 (2006 Policy at 18) (Page ID #1105).

Ultimately, on August 20, 2009, a team of U.S. Bank employees, which included Burk and Wellborn, reviewed "a document that [Burk] put together regarding all of the investigative steps completed." R. 96-1 (Aug. 20, 2009 E-mail) (Page ID #992). "After a lengthy discussion is [sic] was agreed that the recommendation would be made to Steve Saloutos to terminate Serge" because of "a couple of firm ethics violations."[3] *Id.* Although he did not participate in the August 20, 2009 call, Hartnack also participated in and supported the decision to terminate Adamov.[4] R. 46 (Saloutos Dep. at 63) (Page ID #385). On August 31, 2009, Saloutos, Mockapetris, and one other individual informed Adamov that he was terminated. R. 50 (Adamov Dep. at 65) (Page ID #495).

Shortly after his termination, Adamov filed a complaint, which alleged that U.S. Bank violated Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act because it terminated him on the basis of national origin and in retaliation for reporting discrimination.

---

[3]Although the "Smoking Gun" e-mail refers to a 2008 policy, U.S. Bank claims that it did not terminate Adamov "pursuant to a written policy that became effective at some time after May 9, 2007." R. 108-2 (Request for Admissions ¶ 2) (Page ID #1078).

[4]Hartnack claims that he "wasn't effectively the decision-maker" in Adamov's termination. R. 48 (Hartnack Dep. at 20) (Page ID #419).

R. 10 (Am. Compl. ¶¶ 25–30) (Page ID #61–62). The district court awarded summary judgment in favor of U.S. Bank on all counts. *Adamov v. U.S. Nat'l Bank Ass'n*, 776 F. Supp. 2d 447 (W.D. Ky. 2011); *Adamov v. U.S. Nat'l Bank Ass'n*, No. 3:09CV-868-S, 2012 WL 3637677 (W.D. Ky. Aug. 23, 2012). Although we affirmed the district court's judgment with respect to Adamov's national-origin claim, we reversed its judgment with respect to Adamov's retaliation claim. *Adamov*, 726 F.3d at 852. The district court has since, and for a second time, awarded summary judgment in U.S. Bank's favor. *Adamov v. U.S. Nat'l Bank Ass'n*, No. 3:09-CV-00868-CRS, 2016 WL 1090630 (W.D. Ky. Mar. 18, 2016). It held that Adamov did not establish causation as part of his prima facie showing of retaliation. *Id.* For the reasons that follow, we remand Adamov's retaliation claim to the district court once more, this time because there is a triable issue of causation and pretext.

## II. DISCUSSION

### A. Standard of Review

Because the district court awarded summary judgment, we review its decision de novo and view the facts in the light most favorable to Adamov, the nonmoving party. *See Ford Motor Co.*, 782 F.3d at 760. If there is a genuine dispute of material fact—that is, "when the plaintiff presents significant probative evidence on which a reasonable jury could return a verdict for her"—summary judgment is inappropriate. *See id.* (internal quotation marks omitted).

### B. Prima Facie Case

The retaliation provision of Title VII states, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any

practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (2012). "To assess these claims, we use the familiar *McDonnell-Douglas* burden-shifting framework. The plaintiff must first establish, by a preponderance of the evidence, her prima facie case. If the plaintiff does so, the defendant has a burden of *production* to articulate a nondiscriminatory reason for its action. If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation." *Ford Motor Co.*, 782 F.3d at 767 (internal quotation marks, citations, and alterations omitted).

The key question in this case is whether the district court correctly found, at the summary-judgment stage, that Adamov did not establish his prima facie case. Specifically, because the parties do not contest the other elements of Adamov's prima facie case, we address whether Adamov has causally linked his protected activity with the adverse employment action. Although "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met," *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000), plaintiffs must nevertheless establish but-for causation at both the prima facie and pretext stages of the *McDonnell-Douglas* framework. *See Ford Motor Co.*, 782 F.3d at 767, 770. *But see Foster v. Univ. of Md.—E. Shore*, 787 F.3d 243, 250–51 & n.10 (4th Cir. 2015) (observing that "circuits disagree as to whether *Nassar* has any bearing on the causation prong of the prima facie case" and holding "that *Nassar* does not alter the causation prong of a prima facie case of retaliation"). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*,

7

570 U.S. ——, 133 S. Ct. 2517, 2533 (2013). A plaintiff can meet that burden "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (internal quotation marks omitted), *cited in Amos v. McNairy Cty.*, 622 F. App'x 529, 537 (6th Cir. 2015) ("Even after *Nassar*, . . . this court has explicitly held that temporal proximity alone can establish causation."). Of course, "combining temporal proximity with other evidence of retaliatory conduct is enough to establish a causal connection" as well. *See id.* at 506. Nevertheless, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *See id.* at 505.

Adamov has put forth sufficient evidence of temporal proximity and other evidence of retaliatory conduct to meet his prima facie burden. Three weeks transpired between Adamov's complaint of national-origin discrimination to the team of investigators, which included Burk, and the recommendation to terminate Adamov, which also included Burk. *See* R. 44-2 (July 30, 2009 Meeting Notes) (Page ID #312); R. 50 (Adamov Dep. at 60) (Page ID #490); R. 96-1 (Aug. 20, 2009 E-mail) (Page ID #992). Eleven days after that recommendation, a group of individuals, including Hartnack, who was aware of Adamov's discrimination complaint against him, decided to terminate Adamov. *See* R. 50 (Adamov Dep. at 60, 65) (Page ID #490, 495). Although we have previously held that being "discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation" on its own, *see Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272–73 (6th Cir. 1986), we have also held that a one-

month difference alone "allow[s] us to make an inference of causation," *see Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 502 (6th Cir. 2013). Therefore, based on temporal proximity alone, Adamov has established causation for purposes of his prima facie showing.[5]

Yet, the short period of time between Adamov's complaint and the termination e-mail is not the sole evidence of causation; increased scrutiny of Adamov's behavior by those who were aware of Adamov's complaints also supports an inference of retaliatory conduct. First, similar wire transfers had been approved in years prior without issue, *see* R. 50 (Adamov Dep. at 50)

---

[5]U.S. Bank and the dissent correctly point out that "[w]hen the employer proceeds along lines previously contemplated, we must not take the temporal proximity of the adverse employment action as evidence of causality." Appellee's Br. at 20 (quoting *Montell*, 757 F.3d at 507 (internal quotation marks and alterations omitted)). But there is no evidence that U.S. Bank "previously contemplated" terminating Adamov. First, Burk did not recommend and Hartnack did not decide to terminate Adamov until after Adamov complained of discrimination. *Compare* R. 50 (Adamov Dep. at 48, 61) (Page ID #478, 491), *with* R. 369 (Saloutos Dep. at 47) (Page ID #369); R. 41-2 (Burk Decl. ¶ 8) (Page ID #279). It is true that the anti-money laundering department launched an investigation into Adamov before Adamov complained. But, as the dissent points out, these investigations appear to be "routine," *see* Dissent at 3, and unrelated to punishment, let alone termination. *See* R. 50 (Adamov Dep. at 50) (Page ID #480) (observing that "my wire transfer were approved by the head of AML department, Mr. Pete Selenke, for the last three, four years. I specifically asked him several times if I should not conduct business with my family on the U.S. Bank account. And he said, 'As long as we know and we know you, you have nothing to worry about. You don't have to go to another bank."). Second, U.S. Bank has pointed to no policy that would justify Adamov's termination. In fact, the ethics policy that applied to Adamov at the time of his termination does not provide grounds for his termination. The provision that allegedly proscribes Adamov's behavior, *see* Appellant's Br. at 24, applies to "employees in the securities industry," R. 108-4 (2006 Policy at 19) (Page ID #1106), not to retail bankers such as Adamov, R. 50-1 (Adamov Resume) (Page ID #573). Moreover, the 2006 policy did not prohibit lending to customers. *See* R. 108-4 (2006 Policy at 18) (Page ID #1105). Without evidence that U.S. Bank "previously contemplated" terminating Adamov when it interviewed him regarding the $10,000 loan, we cannot discount the suspicious temporal proximity between Adamov's complaint of discrimination at that interview and U.S. Bank's decision to terminate him. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (holding that temporal proximity did not support a prima facie case where the employer "was contemplating the transfer before it learned of the suit").

(Page ID #480); R. 108-1 (1st Def. Interrogs. at 6) (Page ID #1065), but it was only after Adamov complained of discrimination to Mockapetris and indirectly to Hartnack that U.S. Bank conducted a deeper investigation. *Compare* R. 50 (Adamov Dep. at 48, 61) (Page ID #478, 491), *with* R. 41-2 (Burk Decl. ¶ 3) (Page ID #278). Moreover, less than two weeks after Adamov complained to Burk of discrimination, John B. Wellborn, the Chief Security Officer at U.S. Bank, sent her a curious e-mail that also suggests increased scrutiny. R. 41-2 (Burk Decl. ¶¶ 6–7) (Page ID #278–79). In the first place, its title, "Smoking Gun," itself could suggest to a reasonable juror that U.S. Bank was searching for a reason to terminate Adamov, which, combined with temporal proximity, could give rise to an inference of causation. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). Second, and crucially, the e-mail mysteriously cites a 2008 ethics policy that was not in effect during the 2007 wire transfer. *Compare* R. 41-2 (2008 Policy at 30) (Page ID #286), *and* R. 50-1 (Smoking Gun E-mail) (Page ID #575), *with* R. 108-4 (2006 Policy at 18) (Page ID #1105). Unlike the 2008 policy, the 2006 policy, which was in effect during the 2007 wire transfer, *see* Appellant's Br. at 5; Appellee's Br. at 24, does not prohibit employees from lending money to customers. *See* R. 108-4 (2006 Policy at 18) (Page ID #1105). And yet, Adamov was ostensibly terminated for lending to a customer. *See* R. 46 (Saloutos Dep. at 42) (Page ID #364). We have previously held that "[t]he combination of . . . increased scrutiny with the temporal proximity of [three months] . . . is sufficient to establish the causal nexus needed to establish a prima facie case," *Hamilton*, 556 F.3d at 435–36. The causal nexus is knotted even tighter in cases like this, where the basis of increased scrutiny is so spurious.

## C. Pretext

Finally, even if U.S. Bank has identified a legitimate, nonretaliatory reason for terminating Adamov, the parties dispute whether such a reason was pretext for retaliation. *See* Appellant's Br. at 21–35; Appellee's Br. at 23–28; Reply Br. at 13–20; R. 103 (Def.'s Mot. Summ. J. at 6–8) (Page ID #1025–27); R. 108 (Pl.'s Resp. to Def.'s Mot. Summ. J. at 14–20) (Page ID #1051–57); R. 109 (Def.'s Reply Mem. in Support of the Mot. Summ. J. at 7–10) (Page ID #1181–84). Although the district court did not address pretext because it awarded summary judgment on prima-facie grounds, "[t]his court may address issues raised by the parties on appeal even where the district court has not explicitly ruled on the issues." *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 799 (6th Cir. 2012). Exercising this authority, we hold that there are genuine issues of material fact on whether U.S. Bank's asserted reason to terminate Adamov was pretext for retaliation.

The ultimate issue in making a retaliation claim is whether the employee's "protected activity was a but-for cause of the alleged adverse action by the employer." *See Nassar*, 133 S. Ct. at 2534. Applied to the pretext prong, this principle dictates that "a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *Ford Motor Co.*, 782 F.3d at 767. For purposes of summary judgment, Adamov has made such a showing: A reasonable jury could conclude that the $10,000 loan was not the real reason for terminating Adamov. Rather, it could conclude that, because U.S. Bank increasingly scrutinized and ultimately terminated Adamov shortly after he complained of discrimination, the real reason was retaliation for such complaints.

11

First, a reasonable jury could conclude that U.S. Bank did not terminate Adamov for loaning $10,000 to his college friend. Although we previously held that there was no showing of pretext with respect to Adamov's discrimination claim, *see Adamov*, 726 F.3d at 855, nothing in the record on our previous review suggested that the 2008 policy was any different from the 2006 policy, *see id.* at 853 ("Although the [2008] policy went into effect after the date of the loan, no prior policy was introduced by either Adamov or the bank."). We now know, thanks to Adamov's filing of the 2006 policy, that the operative ethics policy at the time of Adamov's termination did not proscribe his behavior.[6] *See* R. 108-4 (2006 Policy at 18) (Page ID #1105) (prohibiting employees "from borrowing from customers" but not from lending to them). Therefore, there is a genuine issue of material fact on whether U.S. Bank's proffered reason for terminating Adamov—the $10,000 loan to his college friend—was the real reason for its action. *See Ford Motor Co.*, 782 F.3d at 767; *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 590 (6th Cir. 2009) (holding that there was pretext when "two of Ford's four proffered reasons for terminating

---

[6]U.S. Bank repeatedly stresses that "[a]t all pertinent times, U.S. Bank prohibited employees from loaning money to customers." *See, e.g.*, Appellee's Br. at 27. But as discussed *supra* note 5, U.S. Bank has pointed to no evidence in support of this claim. Similarly, U.S. Bank argues that because it had the "honest belief" that Adamov violated company policy, "Adamov is required to show that U.S. Bank's decision-making process was an error too obvious to be unintentional." Appellee's Br. at 25–26 (internal quotation marks and alterations omitted). U.S. Bank misstates the burden of production under the honest-belief rule. "[T]he burden is on the employer to point to specific facts that it had at the time the decision was made which would justify its belief in the proffered reason." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007). It has not pointed to any such facts, so it cannot invoke the honest-belief rule to require Adamov to show that U.S. Bank's error was "too obvious to be unintentional." At any rate, a reasonable jury could find that its mistake was too obvious to be unintentional; U.S. Bank applied a policy that did not exist when Adamov committed the alleged infraction.

Upshaw . . . do not typically warrant *any* formal discipline at Ford's Sharonville plant, let alone termination").

Second, a reasonable jury could conclude that U.S. Bank's real reason for terminating Adamov was unlawful retaliation. As discussed in the previous section, three weeks after Adamov complained to Burk of national-origin discrimination, Burk recommended his termination. *See* R. 44-2 (July 30, 2009 Meeting Notes) (Page ID #312); R. 50 (Adamov Dep. at 60) (Page ID #490); R. 96-1 (Aug. 20, 2009 E-mail) (Page ID #992). Hartnack, who knew that Adamov complained of discrimination, decided to terminate Adamov eleven days later. *See* R. 50 (Adamov Dep. at 60, 65) (Page ID #490, 495). Such temporal proximity between complaints of discrimination and termination "seems suspicious" and supports an inference of retaliation. *See Ford Motor Co.*, 782 F.3d at 767.

Moreover, Adamov has pointed to evidence that U.S. Bank ramped up its scrutiny of him after his complaints. U.S. Bank opened an investigation into the $10,000 loan after Adamov complained of discrimination, even though it had approved similar wire transfers in previous years without issue. *See* R. 50 (Adamov Dep. at 50, 61) (Page ID #480, 491); R. 108-1 (1st Def. Interrogs. at 6) (Page ID #1065); R. 41-2 (Burk Decl. ¶ 3). And, the e-mail entitled "Smoking Gun" could suggest that the investigators were looking for a reason to terminate Adamov, even if that reason was unsupported by the cited ethics policy. *See* R. 41-2 (Burk Decl. ¶¶ 6–7) (Page ID #278–79). *Compare* R. 41-2 (2008 Policy at 30) (Page ID #286), *and* R. 50-1 (Smoking Gun E-mail) (Page ID #575), *with* R. 108-4 (2006 Policy at 18) (Page ID #1105). We have previously held that such heightened scrutiny would allow a reasonable jury to find but-for

13

causation. *See EEOC v. New Breed Logistics*, 783 F.3d 1057, 1070 (6th Cir. 2015); *Hamilton*, 556 F.3d at 436–37. Our holding is no different in this case; a jury should decide whether U.S. Bank terminated Adamov "because he has opposed any practice made an unlawful employment practice by Title VII." *See* 42 U.S.C. § 2000e-3(a).

### III. CONCLUSION

When the facts are viewed in the light most favorable to Adamov, a reasonable jury could conclude that (1) there was a causal connection between his discrimination complaints and U.S. Bank's decision to terminate him and (2) U.S. Bank's proffered reason for terminating Adamov was pretext for retaliation. Therefore, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

**ROGERS**, Circuit Judge, dissenting.

It is hard to see what U.S. Bank may have done wrong here. To comply with federal anti-money-laundering and other laws, U.S. Bank regularly monitors its customers' bank accounts. In the course of such monitoring, it discovered that one of its employees, Serge Adamov, had made a personal loan to a customer, potentially creating a conflict of interest. In response, U.S. Bank carried out an investigation and then terminated Adamov. However, Adamov claims that U.S. Bank retaliated against him, based on a remark Adamov made during this investigation that he believed he was being questioned because of a prior complaint of discrimination based on his Russian/Azerbaijani national origin. This was not enough to avoid summary judgment.

First, it is not enough to rely on a temporal proximity of only one month between Adamov's complaint and his termination, which takes Adamov's complaint to the corporate security department as his protected activity, and thereby counts only the period between his protected activity in July 2009 and his termination in August 2009. The investigation that resulted in Adamov's termination actually began *before* Adamov's complaint to the corporate security department, in June 2009. R. 108-1, PageID # 1065. An employer's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam); *see also Montell v. Diversified Clinical Services, Inc.*, 757 F.3d 497, 507 (6th Cir. 2014). The fact that the corporate security department launched an investigation into Adamov's personal banking and questioned him about the personal loan to a bank customer—both before he

15

complained of discrimination—shows that discipline was at least "previously contemplated," and thus that the one-month span between his complaint and termination can be "no evidence whatever of causality."

It is true that the recommendation and decision to terminate Adamov did not occur until after his complaint, and that nothing in the ethics policy suggested that his termination was a foregone conclusion. But the Supreme Court and this circuit have explicitly stated that a course of action need only be "previously contemplated," but not "definitively determined." *See Breeden*, 532 U.S. at 272; *Montell*, 757 F.3d at 507. This case is fully disposed of by the language in *Breeden* and *Montell*.

Furthermore, even if Adamov's termination was somehow not "previously contemplated," the prior investigation should still weigh heavily against using a one-month period as evidence of temporal proximity. True, we have held in an unpublished case that a one-month difference alone "allow[s] us to make an inference of causation," *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 502 (6th Cir. 2013). But we have also cautioned, again and again, against relying on temporal proximity alone. *See, e.g.*, *Vereecje v. Huron Valley School Dist.*, 609 F.3d 392, 400 (6th Cir. 2010); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir.2007); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir.2006). This is an especially bad case to decide based on temporal proximity, because the prior investigation provides a clear, independent cause for Adamov's termination, even if it somehow does not establish that Admaov's termination was not "previously contemplated."

There is little additional evidence of causation. Adamov relies on purported evidence of increased scrutiny, but the record does not support this contention. Even after discovery, there is no evidence of any communication between Hartnack, SaLoutos, and Mockapetris—Adamov's three supervisors who knew about his first complaint of discrimination—and the corporate security department. In fact, the record shows that a computer-generated sweep of customers' (including Adamov's) bank accounts first prompted the corporate security department to investigate, R. 108-1, PageID # 1067, and that Adamov's three supervisors were only notified once the investigation was well under way, R. 46, PageID # 358; R. 48, PageID # 418; R. 52, PageID # 641. Furthermore, these sweeps and investigations appear common. U.S. Bank carries out such activity to comply with federal anti-money-laundering law, *see* R. 46, PageID # 357-58, and Adamov's unusual banking activity had prompted several previous investigations, including in December 2005, November 2008, and December 2008. R. 108-1, PageID # 1065. Therefore, the final investigation that resulted in Adamov's termination was routine, not "increased," scrutiny. This weak evidence of "increased scrutiny" does not bolster the flawed evidence of temporal proximity.

In any event, as we indeed reasoned in our previous decision, *Adamov v. U.S. Bank Nat. Ass'n*, 726 F.3d 851, 853 (6th Cir. 2013), Adamov has not sufficiently shown pretext. U.S. Bank has put forth a legitimate, non-discriminatory reason for Adamov's termination: Adamov's personal loan to a bank customer, which has just as much potential as a clearly forbidden personal loan from a customer to "create the potential for a conflict of interest between your interests, the customer's interests, and those of U.S. Bank." R. 108-4, PageID # 1106. The only

possible basis for distinguishing our prior decision that there was no pretext is the purported discrepancies in U.S. Bank's 2006 and 2008 ethics policies:  The 2006 policy that governed Adamov's behavior at the time of the loan technically proscribed only  "borrowing from" customers, R. 108-4, PageID # 1105; it was not until 2008 that the ethics policy specifically proscribed "borrowing money from (or lending money to) customers," R. 108-5, PageID # 1132. This is not a case in which the close parsing of technical language is appropriate.  Rather, we are merely asking whether Adamov has shown that U.S. Bank's proffered reason was not the real reason for its actions, and the difference in policies is very weak evidence of such a claim.  U.S. Bank has also met its burden under the honest-belief rule of "point[ing] to specific facts that it had at the time the decision was made which would justify its belief in the proffered reason." *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007) (stating the burden). These specific facts include Adamov's personal loan to a customer and the policies demonstrating that U.S. Bank was legitimately concerned about the conflicts of interest caused by personal loans to and from customers.  *See* U.S. Bank Br. 23-28.

Accordingly, I would affirm the judgment of the district court.