RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0202p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

KAREN KENNEY,

        *Plaintiff-Appellant*,

    *v.*

ASPEN TECHNOLOGIES, INC.,

        *Defendant-Appellee*.

No. 19-1027

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-11282—George Caram Steeh III, District Judge.

Argued:  August 6, 2019

Decided and Filed:  July 6, 2020

Before:  SUTTON, GRIFFIN, and READLER, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:**  Syeda F. Davidson, BURGESS SHARP & GOLDEN, PLLC, Clinton Township, Michigan, for Appellant.  Scott T. Patterson, BUTZEL LONG, Bloomfield Hills, Michigan, for Appellee.  **ON BRIEF:**  Syeda F. Davidson, BURGESS SHARP & GOLDEN, PLLC, Clinton Township, Michigan, for Appellant.  Scott T. Patterson, BUTZEL LONG, Bloomfield Hills, Michigan, for Appellee.

─────────────

## OPINION

─────────────

CHAD A. READLER, Circuit Judge.  Karen Kenney asserts claims under both Title VII of the Civil Rights Act and Michigan's Elliott-Larsen Civil Rights Act.  Those claims turn on her allegation that her former employer, Aspen Technologies, Inc., terminated her employment in

retaliation for her complaints regarding Aspen's alleged discriminatory hiring practices. The district court granted summary judgment to Aspen, finding that Kenney failed to establish a prima facie case of retaliation. We **AFFIRM**.

## BACKGROUND

The main characters in this dispute have a long, shared history. Ken Beethem (Aspen's principal shareholder), Keith Quinn (Aspen's Vice President), and Karen Kenney worked together on three occasions. Relevant here are their two chapters of shared employment at Aspen, a Michigan automobile parts manufacturer located at the scenic intersection of Brighton, Milford, and South Lyon Townships, on the border of Livingston and Oakland Counties.

During her initial tenure at Aspen, Kenney was employed as a salaried plant manager. Over the course of Kenney's approximately four years of service, Beethem and Quinn perceived Kenney as being too harsh in her interactions with hourly employees, and as causing friction among the management team. Kenney ultimately resigned from Aspen to move west, taking a job in Arizona.

History would repeat itself. Seven years later, Beethem asked Kenney to return to Aspen. The company was in need of a production manager due to the launch of three new parts programs, and Beethem thought Kenney could help "tighten up the ship" with respect to managing Aspen employees. Surprised by the offer, Kenney went to see Beethem and Quinn at Aspen's offices. She was re-hired on the spot, without an interview, to start in May 2015.

Despite Kenney's uneven history at Aspen, Quinn was optimistic she could easily reassimilate given her familiarity with Aspen's production operations. But in many respects, those hopes were soon dashed. In the three months following Kenney's rehire, employee turnover sharply increased. Aspen had experienced employee retention problems in the past due to its pay scale. Yet as explained by April Jewell, Aspen's human resources manager, the quit rate spiked during Kenney's tenure, with dozens of employees saying they quit because of Kenney. All of this came at a time when Aspen needed to retain employees to meet increased production demands.

On top of the high turnover rate attributed to Kenney's management style, two formal complaints were lodged against her for mistreating employees. One involved an Aspen employee's husband who wrote to company management to complain that his pregnant wife had been mistreated by Kenney. The complaint detailed five instances the employee's husband considered to establish a "pattern of ongoing intended harassment." Separately, another employee wrote to Aspen claiming she was being targeted by Kenney, describing Kenney's conduct as damaging employee morale and causing "everyone, every day [to be] on edge."

On the basis of these workplace issues, Jewell says she recommended to Beethem that Kenney be terminated. When Beethem approached Quinn about firing Kenney, Quinn says he had no objection. Ultimately, Beethem fired Kenney on July 31, 2015, just three months after her return to Aspen.

Following her termination and her filing of a subsequent administrative complaint, Kenney filed a complaint in federal court alleging that Aspen terminated her employment in retaliation for her complaints about alleged discriminatory practices at Aspen. Chief among her allegations, Kenney asserted that shortly after she returned to Aspen, in mid-May 2015, she spoke to Jewell about what she perceived to be the company's difficulty in obtaining employees. In response to a question from Kenney about Aspen's recruiting practices, Jewell allegedly responded that Aspen was advertising for employees in Livingston and Oakland Counties, the counties that bordered Aspen's facility. Kenney asked why Aspen was not "pulling from Detroit and Flint," communities located in Wayne and Genesee Counties, respectively. Jewell allegedly responded that Beethem "did not like that demographic." Kenney asked Jewell to explain what she meant. Kenney alleges Jewell responded "something to the effect of black people, colored people." Kenney says she then explained that racially discriminatory hiring practices are illegal.

Immediately after her discussion with Jewell, Kenney alleges she made the same complaint to Quinn, repeating Jewell's observation regarding Beethem's hiring preferences. Although Kenney cannot remember Quinn's exact words, she says he confirmed that "Ken [Beethem] has a problem with black people."

Jewell and Quinn acknowledge speaking with Kenney about Aspen's job recruitment efforts, but deny that she complained about discriminatory activity. Jewell testified (and Kenney does not dispute) that Aspen's job recruitment was done on the internet, and thus not limited by geography. Jewell says she further explained to Kenney that employees carpooling from long distances (like Detroit and Flint) can lead to multiple people being out of work on a given day if the driver becomes unavailable. Nevertheless, Jewell added, that did not prevent Aspen from hiring from those areas.

Kenney adds a second purported example of retaliatory intent, albeit with less detail. According to Kenney, during the gap between her periods of employment at Aspen, as company business slowed, certain employees worked reduced hours, simultaneously receiving unemployment benefits. When work picked back up, a number of these employees continued to collect unemployment. Kenney says Beethem "zeroed in on" the three black employees, recommending them for prosecution. The three later pled guilty to fraud charges. According to Kenney, white employees engaged in similar conduct without prosecution. Kenney admits, however, that the prosecuted employees continued collecting benefits when told to stop, whereas the employees who were not prosecuted stopped collecting benefits when asked to do so. Kenney estimates that she may have spoken with Quinn about these events in June or July of 2015.

On this record, the district court granted Aspen's motion for summary judgment. In the eyes of the district court, Kenney had not offered sufficient evidence to establish a prima facie case of retaliation. Kenney timely appealed.

## ANALYSIS

We review the district court's grant of summary judgment de novo. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is appropriate when there is no genuine dispute of material fact, and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Drawing all reasonable inferences in favor of the nonmoving party, a court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

*Title VII Retaliation*

Kenney alleges Aspen violated Title VII by retaliating against her for her complaints about allegedly racist conduct by Beethem. *See* 42 U.S.C. § 2000e–3(a). Because Kenney offers no direct evidence of retaliation, we consider her claim under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, Kenney has the initial burden of establishing a prima facie case of retaliation. To do so, she must point to evidence sufficient to convince a jury that: (1) she engaged in activity protected under Title VII; (2) Aspen knew that she exercised her protected rights; (3) an adverse employment action was subsequently taken against her; and (4) Kenney's protected activity was the but-for cause of the adverse employment action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730–31 (6th Cir. 2014); *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 468–69 (6th Cir. 2012). If Kenney can establish her prima facie case, the burden shifts to Aspen to provide a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. Should Aspen do so, the burden of production shifts back to Kenney to demonstrate that Aspen's proffered reason was a mere pretext for discrimination. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).

*Kenney's May 2015 complaint.* The first three prima facie elements are relatively easy to resolve as to Kenney's alleged complaint in May 2015. Kenney alleges with some detail that she complained to Jewell and Quinn about Aspen's hiring practices. Kenney was later terminated, which all agree constitutes an adverse employment action. And both Jewell and Quinn admit influencing Beethem's decision to fire Kenney, a fact seemingly confirmed by Beethem's termination letter, which explained that the decision to terminate Kenney was made collectively. *See Johnson v. Donahoe*, 642 F. App'x 599, 607 (6th Cir. 2016) ("An employer can be held liable for the actions of a supervisor when the intermediate employee influences the unbiased decision-maker to take an adverse action." (cleaned up)). While Aspen disputes that Kenney complained to Jewell and Quinn specifically about racially discriminatory hiring practices, we have enough evidence, at this stage, to draw that inference in her favor.

1. The viability of Kenney's claim thus turns on causation. Whether protected activity was the but-for cause of an adverse employment action depends upon the context in which that action occurs. *See Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." (quoting *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005))). Temporal proximity alone generally is not sufficient to establish causation. *See, e.g.*, *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006). Exceptions to this rule are "rare," even in instances involving relatively short time periods. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (holding that causation was established by temporal proximity where, among other things, the employee was fired the same day his employer learned of his protected activity).

Kenney was fired at the end of July 2015, about two and a half months after her alleged complaint about Aspen's discriminatory hiring practices. That temporal proximity is one consideration in assessing whether Kenney has satisfied her burden to show causation between her complaint and her termination. But a roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation. *See Vereecke*, 609 F.3d at 401 (noting that "even in *Mickey*, where we articulated the principle that temporal proximity could hypothetically be sufficient in a given case, we noted the presence of additional evidence").

So it is up to Kenney to provide other indicia to support a causal connection. *See id.* at 400 (explaining that the absence of corroborative causal evidence undermines a theory of causation). Those indicia are lacking. Kenney does not dispute that, following her alleged complaint about Beethem's recruiting practices, two formal complaints were filed against her for harassing employees. Nor does Kenney dispute the hiring challenges Aspen faced. Indeed, her underlying claim is that she approached Aspen about job recruitment because she was concerned the company was unable to attract employees. She likewise has not pointed to evidence that any of the dozens of employees who quit did so for reasons other than her harsh management style.

All things considered, there is nothing "unusually suggestive" about the timing of Kenney's termination. *MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 465–66 (6th Cir. 2011).

2. Kenney responds by pointing to what she describes as heightened scrutiny of her work performance. True, close temporal proximity coupled with evidence of heightened scrutiny may be enough to satisfy a Title VII plaintiff's burden on causation at the prima facie stage. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009). But, like the district court, we see no evidence that Kenney's job performance was unduly scrutinized.

Generally speaking, heightened scrutiny is reflected by a similar three-step pattern: an employee engages in conduct that, while technically objectionable, is blessed, or at least tolerated, by the employer; the employee engages in protected activity; the employer then takes an adverse action against the employee for conduct the employer had previously allowed. *See, e.g.*, *Adamov v. U.S. Bank Nat'l Ass'n*, 681 F. App'x 473, 479 (6th Cir. 2017) (heightened scrutiny found where a bank terminated an employee shortly after protected activity for a wire transfer that had been approved before without issue); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1063, 1070 (6th Cir. 2015) (heightened scrutiny found where employee was terminated for tardiness on the same day she complained of harassment, but had been tardy on previous occasions without incident). From this pattern, one might conclude the real reason for the adverse action is the protected activity, not the technical rule violation. A necessary and "critical" aspect of a heightened scrutiny theory is thus that the scrutiny increases after the employee engaged in protected conduct. *Hamilton*, 556 F.3d at 436.

To that end, Kenney points to testimony that she was harsh and abusive with employees during her first stint at Aspen, conduct for which, all seem to agree, Kenney was never seriously disciplined, let alone terminated. But given the nearly eight-year gap (and thus the many intervening developments) separating the periods Kenney seeks to compare for purposes of her heightened scrutiny theory, it is difficult to believe she is comparing apples to apples. That fact alone dramatically undermines Kenney's claim. *Cf. Vereecke*, 609 F.3d at 401 (noting that the causation inquiry involves a totality of the circumstances analysis, in which passage of time is relevant).

So too does Kenney's failure to offer evidence that her prior conduct was materially similar to the conduct Aspen says led to her termination in 2015. The critical considerations in 2015 were Aspen's period of increased production, a high rate of employee turnover attributable to Kenney, and formal complaints made against her. None of those considerations seem to have been at play during Kenney's initial tenure. Which further dooms her claim. After all, Aspen's decision to impose greater discipline following conduct that had a greater negative effect on the company is not evidence of heightened scrutiny.

*Cantrell v. Nissan North America, Inc.* does not lead us to think otherwise. 145 F. App'x 99 (6th Cir. 2005). In *Cantrell*, the employer tolerated years of severe and disruptive conduct by the plaintiff, antics that ranged from threatening to kill co-workers to making sexual comments to a manager to pervasive harassment of other employees. *Id.* at 102–03. That severe misconduct continued even after plaintiff was reassigned. After a second reassignment, the plaintiff took a leave of absence. While on leave, she filed an EEOC complaint regarding disability discrimination. Not long after her complaint was dismissed, the plaintiff's supervisor recommended her termination due to a panic attack suffered while watching a work video. *Id.* at 103–04. In equating the company's conduct following the EEOC complaint to heightened scrutiny, we found dispositive the fact that the plaintiff was terminated for conduct far less serious than that which gave rise to her previous disciplinary problems. *Id.* at 106. Not so here, where Kenney has failed to establish that she engaged in materially similar or worse conduct during her initial tenure.

3. We have similarly held that an intervening cause between protected activity and an adverse employment action dispels any inference of causation. *See, e.g.*, *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013) (finding that the plaintiff did not establish Title VII causation in part because "an intervening legitimate reason to take an adverse employment action dispels an inference of retaliation based on temporal proximity" (cleaned up)); *Wasek*, 682 F.3d at 471–72 (finding that the plaintiff could not meet the causation prong of his prima facie Title VII retaliation claim because the "[plaintiff's] decision to leave the worksite was an intervening event"). As developed for summary judgment, the record here reflects at least two intervening causes: the complaints filed against Kenney and the documented instances of Aspen employees

leaving due to her management style. Either one would qualify as an intervening cause justifying Kenney's termination. Kenney's retaliation claim based upon her complaints over Aspen's hiring practices thus fails on this ground as well.

*Kenney's alleged complaint about differential treatment of employees.* Kenney separately contends that in "June or July" of 2015 she spoke with Quinn about black employees who were prosecuted at Beethem's urging for improperly receiving unemployment benefits, while white employees were not. Title VII, of course, forbids discrimination against an employee because the employee has opposed a practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). But Kenney lacks sufficient evidence here to satisfy two requirements of a prima facie case of Title VII retaliation.

To start, she has not met her burden to demonstrate how this purported complaint amounts to protected activity under federal law. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 719–21 (6th Cir. 2008). Kenney offers few details from her conversation with Quinn. Most conspicuous, while Kenney says she "questioned" Quinn about Beethem's treatment of the prosecuted employees, she has not cited evidence that she advised Quinn that Beethem's conduct was discriminatory or illegal. True enough, Kenney's complaint need not have been lodged with a high degree of formality or precision. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015). But on this record, her purported complaint fails even that marker, as we lack sufficient detail to find that her conversation with Quinn amounted to more than a "vague charge of discrimination." *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). More is needed to establish a prima facie case of retaliation. *See Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009).

And even if Kenney could establish she engaged in protected activity, she fails to demonstrate causation. Consider her own testimony. Kenney says that although she spoke to Quinn in June or July, she "did not record the dates," and thus is unsure when any conversations beyond her May 2015 complaint took place. These vague assertions, coupled with a conjectural timeline, do not overcome the otherwise largely undisputed point that the employee complaints against her were an intervening cause between her May protected activity and her termination.

*See Kyle-Eiland v. Neff*, 408 F. App'x 933, 942 (6th Cir. 2011).  All told, Kenney has not met her burden to establish a prima facie case of retaliation.

*No pretext as to both theories.*  Even if we thought Kenney established a prima facie case of retaliation with respect to either theory, we would reach the same conclusion anyway.  Aspen produced an above-board reason for firing her: The attrition rate doubled under her supervision, during a time when the company needed to increase its workforce to keep up with its contracts.  And Kenney has not produced evidence that Aspen's reason "has no basis in fact," "did not actually motivate the adverse action," or "was insufficient to motivate the adverse action." *Abbott*, 348 F.3d at 542.  Kenney doesn't dispute that more employees quit while she managed the floor.  She doesn't say other people behaved the same way without getting fired.  And she acknowledges Aspen had serious trouble hiring and retaining employees.  The district court thus did not err in granting Aspen's motion for summary judgment.

### Michigan Law

"Michigan courts use the federal Title VII framework to assess retaliation claims." *Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 114 (6th Cir. 2018) (citing *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005); then citing *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520–21 (Mich. 2001)).  "When construing ELCRA, Michigan courts look to Federal Title VII jurisprudence to guide [their] interpretation." *Rodrigues v. Delta Airlines, Inc.*, 644 F. App'x 629, 633 (6th Cir. 2016) (cleaned up).  Guided by that jurisprudence, we see no reason to find Aspen liable under the ELCRA absent liability under Title VII.  The district court therefore did not err in granting summary judgment to Aspen on Kenney's ELCRA claim.

### CONCLUSION

For the aforementioned reasons, we **AFFIRM** the judgment of the district court.