RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0260p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SHAINA M. KIRKLAND,

                        *Plaintiff-Appellant*,

    v.

CITY OF MARYVILLE, TENNESSEE,

                        *Defendant-Appellee*.

No. 21-5569

───────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:19-cv-00312—Clifton Leland Corker, District Judge.

Argued: April 27, 2022

Decided and Filed: December 5, 2022

Before: GUY, THAPAR, and READLER, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Heather Moore Collins, COLLINS & HUNTER PLLC, Brentwood, Tennessee, for Appellant. Courtney E. Read, WATSON, ROACH, BATSON & LAUDERBACK, P.L.C., Knoxville, Tennessee, for Appellee. **ON BRIEF:** Heather Moore Collins, Caroline Drinnon, COLLINS & HUNTER PLLC, Brentwood, Tennessee, for Appellant. Courtney E. Read, Reid A. Spaulding, WATSON, ROACH, BATSON & LAUDERBACK, P.L.C., Knoxville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge. Shaina Kirkland served as a patrol officer with the City of Maryville's police department. While in that role, Kirkland periodically used her

Facebook account to criticize the county sheriff. Kirkland's supervisors became concerned that her posts would undermine the Department's relationship with their sister law enforcement agency. So they asked her to stop. They also reprimanded her for other behavioral issues.

Matters came to a head following a Facebook post by Kirkland claiming the sheriff had excluded her from a training event because she was female and opposed his reelection. At that point, the City fired Kirkland. Kirkland responded by suing the City, alleging retaliation in violation of the First Amendment, Title VII, and the Tennessee Human Rights Act. The district court granted summary judgment in the City's favor. We now affirm.

## I.

Maryville is a city located in Blount County, Tennessee. Over her career in law enforcement, Shaina Kirkland worked for both the City and the County. She began that career as a corrections officer in the Blount County Sheriff's Office. She left the position following an undisclosed "incident" and an unsuccessful appeal to Sheriff James Berrong.

Kirkland then joined the Maryville Police Department as a patrol officer. Her early tenure there, however, proved uneven. For example, she received "verbal counseling and remedial training" for an improper warrant application. And she was twice reprimanded when citizens complained about her "rude and unprofessional" behavior during traffic stops.

The Department eventually made Kirkland a field training officer. In this role, she would have new officers accompany her for training purposes while on patrol. This service too was not without incident. In one instance, Kirkland griped to a trainee that she had been passed over for traffic unit assignments in favor of male officers. (Kirkland, however, lacked a Tennessee motorcycle endorsement, which was needed to work in the traffic unit, resulting in her repeated rejections for the position.) She also criticized the shoes officers must wear as well as the field training program for new officers. Upon learning of these exchanges, Captain Sharon Moore, Kirkland's superior officer, undertook an investigation. At the investigation's close, Moore issued Kirkland a written reprimand for her "negativity toward th[e] department" and suspended her from her training duties.

Other incidents involving Kirkland emanated from her apparent resentment for Sheriff Berrong, who she was familiar with from her tenure at the Blount County Sheriff's Office. A number of years into her service with the City, Kirkland made two Facebook posts criticizing Berrong, who was running for re-election. One belittled his public speaking abilities; the other referred to his supporters as "brainwashed minions." A concerned citizen complained about the posts, questioning whether an officer who publicly criticizes a sheriff and his deputies could work effectively alongside them. Kirkland's superiors found her conduct inappropriate and issued a reprimand. Kirkland was allowed to post "supporting views" of political candidates but was cautioned against posting "negative comments," as the Department must "maintain working relationships with other agencies and departments to provide services to the public."

Months later, Kirkland attended a Sheriff's Office event to satisfy an annual training requirement. At the training, Kirkland participated in a "high stress" exercise during which she drove an SUV in a simulated gunfight. Despite being a simulation, the exercise veered into treacherous territory when Kirkland nearly ran over a Sheriff's deputy. Complicating matters, Kirkland later refused to shake a Sheriff's Office investigator's hand.

After the event, Sheriff Berrong wrote to Tony Crisp, the Maryville Police Chief. Berrong informed Crisp that Kirkland was barred from attending future Sheriff's Office training events due to her "blatant disrespect for our training instructors and deputies" and her "unsafe" conduct. Crisp asked Captain Moore to investigate. Moore documented Kirkland's "childish" behavior at the event as well as her history of disciplinary issues, including her Facebook posts mocking Berrong. Moore recommended that Kirkland be suspended without pay for three days. Crisp agreed. City Manager Greg McClain ultimately upheld the recommendation due to "the disrespectful manner in which [Kirkland] conducted [her]self."

Before Kirkland's suspension began, she complained to McClain regarding purported sex discrimination within the Department. According to Kirkland, her superiors had discriminated against her "for being a female when it comes to special assignments [i.e., the Traffic Unit] and days off." Later that week, Kirkland submitted the same accusations to the Equal Employment Opportunity Commission.

Six months passed.  At that point, Kirkland filed a "grievance" with Chief Crisp.  In addition to repeating her claims of sex discrimination, Kirkland also complained about her continued ban from Sheriff's Office training events.  Crisp denied the grievance as factually unsupported, adding that he had "addressed most of these complaints previously when [Kirkland] appealed [her] 3 day suspension."  Nonetheless, Crisp did ask (albeit to no avail) Sheriff Berrong to allow Kirkland to attend future training sessions.

Things soon came to a head.  Despite her earlier instructions to refrain from negative social media commentary, Kirkland shared on Facebook an unflattering article about Sheriff Berrong.  The article's title read:  "Sheriff's connections to private contractor are cozy, but lawyer says not illegal."  Kirkland added her own comment:  "Just like I'm sure it's not illegal to ban a female officer from training for not voting for you either."  After learning about the post, Chief Crisp recommended to Assistant City Manager Roger Campbell that Kirkland be terminated because her post violated Department orders requiring officers to maintain good relations with the public and other law enforcement agencies.  Following a disciplinary appeal hearing, McClain upheld the recommendation.  Kirkland was terminated.

Kirkland sued the City.  Relevant here are her claims under 42 U.S.C. § 1983, Title VII, and the Tennessee Human Rights Act.  *Cf. Paige v. Coyner*, 614 F.3d 273, 283–84 (6th Cir. 2010) (addressing the permissible scope of § 1983 municipal liability for First Amendment retaliation).  She alleged that her termination violated the First Amendment and that her suspension without pay and her termination were unlawful retaliation for complaints of sex discrimination, in violation of Title VII and the THRA.  The district court granted summary judgment to the City on those claims.  This appeal followed.

**II.**

To prevail under her First Amendment retaliation theory, Kirkland must show that:  (1) she engaged in constitutionally protected speech, (2) she suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech, and (3) the protected speech was a substantial or motivating factor for the adverse action.  *Wood v. Eubanks*, 25 F.4th 414, 428 (6th Cir. 2022).  The district court granted summary judgment to the City on

that claim, concluding that the City did not violate the First Amendment by firing Kirkland for her May 2019 Facebook post.  Kirkland contests that decision on appeal, emphasizing that the City failed to show "that there is no genuine dispute as to any material fact" or that it was "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing the propriety of Kirkland's challenge, we review the district court's decision de novo, viewing all evidence in the light most favorable to her and drawing all reasonable inferences in her favor.  *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020).

**A.**

We begin by asking whether Kirkland engaged in constitutionally protected speech.  A government employee enjoys the right to speak on matters of public concern.  *Lane v. Franks*, 573 U.S. 228, 235–36 (2014).  That right, however, must be balanced against the need to ensure "efficient provision of public services," as government entities "need a significant degree of control over their employees' words and actions."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  In other words, while "public employees do not forfeit all their First Amendment rights simply because they are employed by the state or a municipality," they necessarily "accept certain limitations on [their] freedom."  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012) (citations omitted).

Under our settled legal framework, Kirkland's speech was constitutionally protected if: (1) she was speaking as a private citizen and not pursuant to official duties, (2) her speech was on a matter of public concern, and (3) her speech interest outweighs the City's interest in "promoting the efficiency of the public services it performs through its employees."  *Id.* at 540 (cleaned up).  As the parties do not contest whether the statements at issue were made in Kirkland's capacity as a private citizen, we turn to whether her speech addressed a matter of public concern.

To make that determination, we look to the "content, form, and context of [Kirkland's] statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).  Issues of public concern include "any matter of political, social, or other concern to the community."  *Id.* at 146.  Quintessential examples include allegations of public corruption,

mismanagement, or misconduct in government, *see Handy-Clay*, 695 F.3d at 543, as well as accusations of discrimination, *see Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015). And Kirkland's post, which suggested sex discrimination and political retribution by an elected official, falls safely within those quintessential categories. *Myers v. City of Centerville*, 41 F.4th 746, 761–62 (6th Cir. 2022).

It may be, as the City contends, that the post was merely the latest episode in Kirkland's "long contentious personal history with Sheriff Berrong." But the key inquiry in this setting "is not *why* [Kirkland] spoke, but *what* [she] said." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 467 (6th Cir. 2017) (citation omitted). Kirkland's speech, in other words, is a matter of public concern so long as its content is something the public has an interest in hearing, no matter the motivation for her speech. *See Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 575 (6th Cir. 1997) (noting the relevant distinction is "between *matters* of public concern and *matters* only of personal interest, not civic-minded motives and self-serving motives") (emphasis in original).

Nor does the City gain traction by painting Kirkland's post as false. Whether her "suspicions were subsequently shown to be correct" is not dispositive here. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007). Instead, we ask whether Kirkland's "statements were of public concern and not false statements deliberately or recklessly made." *Id.* Kirkland's post clears this relatively low bar. The City points us to both a letter from Sheriff Berrong citing Kirkland's "disrespect" as the reason for barring her from future Sheriff's Office trainings as well as the fact that other women continued to attend those trainings. But Kirkland is not required to prove her statements were true. *See Chappel*, 131 F.3d at 576–77; *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (explaining that summary judgment requires more than "purportedly credible evidence that contradicts [the speaker's] story" (citation omitted)). The City did not show Kirkland made the post with knowledge of, or reckless indifference to, its falsity. *See Chappel*, 131 F.3d at 576.

**B.**

Public concern or not, the City says summary judgment in its favor was nonetheless appropriate because the balance of interests under *Pickering v. Board of Education*, 391 U.S. 563 (1968), weighs in its favor. The *Pickering* test weighs Kirkland's speech interest in commenting on matters of public concern against the City's interest, as an employer, in executing its public services efficiently. *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 338 (6th Cir. 2010). The City prevails if it shows "that the potential disruptiveness of [Kirkland's] speech was enough to outweigh whatever First Amendment value it might have had." *Myers*, 41 F.4th at 764 (cleaned up). Although the burden is on the City to demonstrate legitimate grounds for Kirkland's termination, we give "substantial deference" to the City's "reasonable view of its legitimate interests." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 678 (1996).

The heightened need for order, loyalty, and efficiency in law enforcement agencies means they will often "have legitimate and powerful interests in regulating speech by their employees." *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017). With those interests in mind, the City says it terminated Kirkland because her Facebook post threatened to undermine the Maryville Police Department's working relationship with the Blount County Sheriff's Office. Like the district court, we agree that this concern was sufficient to justify Kirkland's termination.

The Department values its relationship with the Sheriff's Office. And for good reason, it seems. The two "share[] responsibilities for effective law enforcement," *Nagel v. City of Jamestown*, 952 F.3d 923, 931 (8th Cir. 2020), and coordinate various training and investigatory functions. For example, the Department has a standing order requiring "all department personnel to maintain good, harmonious working relations and communications with the . . . Sheriff's Office."

There is ample evidence that Kirkland's Facebook post risked undermining this relationship. Start with "the context in which the dispute arose." *Connick*, 461 U.S. at 153. Kirkland had a decade-long history of conflict with the Sheriff's Office, dating back to when she was fired as a corrections officer. Later, during her tenure at the Police Department, she made a series of Facebook posts that asserted sharply personal criticisms of Sheriff Berrong and his

supporters. What is more, following Kirkland's refusal to shake an instructor's hand at the Sheriff's Office training event and her poor performance in the simulation, Berrong personally wrote to Chief Crisp to bar Kirkland from future training events. In her investigative memorandum, Captain Moore (Kirkland's superior officer) observed that Kirkland's behavior had inspired "backlash from the [Sheriff's Office] deputies" and "caused resentment between [the] agencies."

Against that backdrop, it was reasonable for the City to predict that Kirkland's final Facebook post—the latest escalation in "a persistent dispute" between her and the Sheriff's Office, *Connick*, 461 U.S. at 154—would further disrupt the Department's working relationship with the Sheriff's Office. *See Gillis*, 845 F.3d at 687 (explaining that *Pickering* requires only a reasonable prediction of disruption). And preserving that relationship is a weighty interest in the City's favor, *Nagel*, 952 F.3d at 931, especially when those officers "may have to rely on one another in life-threatening circumstances." *Henry v. Johnson*, 950 F.3d 1005, 1013 (8th Cir. 2020).

Kirkland resists this conclusion on two grounds. First, she suggests (without supporting citation) that our *Pickering* analysis should consider only her May 2019 Facebook post and its immediate consequences, not her prior conduct or her history with the Department or the Sheriff's Office. In undertaking *Pickering* balancing, however, we must consider "the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). And placing the speech at issue in context—especially when it "emerged after a persistent dispute," *Connick*, 461 U.S. at 152—enables us to better appreciate the speech's potential disruptive effect on government operations.

Second, Kirkland contends that her speech warrants an especially high level of protection because the content of her speech, purporting to expose discrimination and retaliation in a law enforcement agency, is a traditional matter of public concern. But all things considered, the Police Department has "legitimate and powerful interests" as a law enforcement agency in preserving its working relationship with the Sheriff's Office that outweigh Kirkland's speech rights. *Gillis*, 845 F.3d at 684.

**III.**

Kirkland also alleges that the City retaliated against her after she complained about sex discrimination within the Department.  Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee on the basis of sex.  42 U.S.C. § 2000e-2(a).  The Tennessee Human Rights Act prohibits the same under Tennessee law.  Tenn. Code Ann. § 4-21-401(a).  Under both Title VII and the THRA, an employee may bring an action against an employer for retaliating against individuals who oppose a discriminatory practice.  42 U.S.C. § 2000e-3(a); Tenn. Code Ann. § 4-21-301(a).  Claims under the respective laws are evaluated identically.  *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996)).

As Kirkland offers no direct evidence of retaliation, we assess her claims through the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020).  That framework imposes on Kirkland the burden to establish a prima facie case of retaliation.  *Id.*  To do so, she must show that (1) she engaged in activity protected by the Acts, (2) the exercise of her civil rights was known to the City, (3) the City then took an adverse employment action against her, and (4) there was a causal connection between her protected activity and the adverse action.  *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (citation omitted).  If she does so, the burden shifts to the City to articulate a legitimate, nonretaliatory reason for the adverse action. *Kenney*, 965 F.3d at 448.  At that point, the burden returns to Kirkland, who must demonstrate that the City's proffered justification was pretextual.  *Id.*

Kirkland identifies two adverse actions:  (1) her three-day suspension without pay in June 2018 and (2) her termination from employment in May 2019.  Assuming for argument's sake that Kirkland has made a prima facie showing for retaliation on those claims, we turn to the City's purported alternative, legitimate, nonretaliatory reasons for her suspension and termination.  *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.").  Beginning with Kirkland's suspension, the City did so due to her refusal to shake hands with a

Sheriff's Office investigator at a training event. That this conduct was the basis for her suspension, the district court noted, was "well-documented and consistent up the chain of command." What is more, it is a legitimate basis for imposing discipline—especially when Kirkland's conduct threatened to undermine the City's "important interest" in preserving an "amicable working relationship between . . . two law enforcement agencies." *Nagel*, 952 F.3d at 931.

Next, consider the decision to fire Kirkland. The City says it did so due to her final Facebook post criticizing Sheriff Berrong. The record also corroborates this explanation. And it too is a valid one—the Department's interest in preserving both the public's trust and its relationship with the Sheriff's Office outweighed Kirkland's First Amendment interest in making the post.

As the City offers legitimate, non-retaliatory justifications for Kirkland's suspension and termination, the burden returns to Kirkland to identify a genuine issue of material fact as to whether those reasons were pretextual. To show pretext, she must demonstrate both (1) that the City's proffered reasons for suspending and firing her were not its actual reasons for doing so and (2) that unlawful retaliation was the actual reason. *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 485 (6th Cir. 2010). She can meet this burden by demonstrating that the City's stated reasons "(1) had no basis in fact, (2) did not actually motivate [the City's] action[s], or (3) were insufficient to motivate" the City's actions. *Id.* at 486.

Kirkland invokes the second method of showing pretext. She maintains that the City's stated reasons did not actually motivate the suspension or firing. This is so, she says, because "the sheer weight of the circumstantial evidence of [retaliation]" makes it more likely that the City's actions were retaliation for Kirkland's comments and complaints about sex discrimination. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 503 (6th Cir. 2007) (citation omitted).

But the evidence supports the City, not Kirkland. The City's "reasons for [suspending and] terminating [Kirkland] were . . . contemporaneously documented" and consistent up the chain of command. *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 583 (5th Cir. 2021); *cf. Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 591–92 (6th Cir. 2002) (explaining that an

employer's changing rationale or lack of contemporaneous evidence can be evidence of pretext). The decisions to suspend and later terminate Kirkland's employment followed a series of reprimands over the same issues: her Facebook activity and her disrespectful conduct. And those decisions, it bears adding, were made soon after the events the City says motivated them. Captain Moore recommended suspending Kirkland less than two weeks after her disruptive conduct at the training event. Likewise, Chief Crisp recommended terminating Kirkland mere days after her last Facebook post targeting Berrong. The short duration between Kirkland's misconduct and the City's response lends considerable weight to the City's explanations. *Cf. Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (explaining that close temporal proximity between events suggests a causal relationship).

Kirkland responds with a list of facts she says demonstrate "that Maryville's actions were merely pretext for retaliation." Those facts include, for example, her statement that Crisp was regarded as behaving in a retaliatory fashion by another employee and that she was removed from her position as a field training officer. Yet she fails to explain how these uncontextualized facts show that City Manager McClain, who made the final decision as to both Kirkland's suspension and termination after hearing objections from Kirkland and independently reviewing her record, was motivated by retaliatory animus. *See Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008) (collecting cases) (explaining that, "when a decisionmaker makes a decision based on an independent investigation," the retaliation inquiry focuses on the motivations of that decisionmaker).

In any event, none of the information Kirkland highlights undermines the City's well-documented judgment that her hostility towards the Sheriff warranted disciplinary action. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015) ("An employee seeking to show pretext must rebut each discrete reason proffered by the employer."). For example, Kirkland submits that the Department is "regarded as behaving in a retaliatory fashion by other employees." But she identifies only one such employee. And that employee sings a different tune: she believes she was retaliated against not because of sex discrimination but because she expressed discomfort when she was assigned to patrol duty without adequate training. *See Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1137 (8th Cir. 2020)

("Retaliation against one employee is insufficient, standing alone, to prove retaliation against another employee when the underlying activity is so different.").

At day's end, Kirkland has not met her burden "to put forth sufficient evidence for a reasonable jury to conclude that [the City's] stated reason is false." *Abdulnour*, 502 F.3d at 504 (deeming summary judgment appropriate where the plaintiff raised only "a weak issue of fact as to whether the defendant's reason was untrue" (citation omitted)). As a result, her second retaliation claim also fails.

\* \* \* \* \*

For the reasons discussed above, we affirm the judgment of the district court.