NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0246n.06

Case No. 22-1675

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 01, 2023
DEBORAH S. HUNT, Clerk

TANJA KOVACEVIC,

    Plaintiff-Appellant,

v.

AMERICAN INTERNATIONAL FOODS,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge**. American International Foods ("AIF") fired Tanja Kovacevic from her position as an accounts-payable specialist while she was on COVID leave. She claims that she was fired in retaliation for taking leave, which was protected by the Emergency Paid Sick Leave Act of 2020 ("EPSLA"). But AIF says that it fired her for poor performance. And on AIF's motion, the district court granted summary judgment. Though we assume that Kovacevic makes a prima facie case of retaliation, she fails to demonstrate that AIF's proffered nonretaliatory reasons for terminating her employment were pretextual. So we affirm.

## I.

### A.

AIF hired Tanja Kovacevic as an accounts-payable specialist in January 2020. Her responsibilities included processing bills from and payments to AIF's vendors; reconciling invoice discrepancies; and monitoring the accounts payable email to respond to requests for information.

AIF is a food-ingredient distributor with about 38 employees. AIF's Chief Financial Officer, Scott Goldberg, supervised Kovacevic. Director of Operations Tom Michele, Human Resources Manager Bob Barber, and AIF's receptionist Ashley Benton also worked with Kovacevic.

In hiring Kovacevic, AIF gave her an offer letter and Employee Handbook. Both the offer letter and Handbook stated (in slightly different wording) that Kovacevic would "be expected to be involved in a 30, 60, 90 day, 6 month and annual reviews."[1] (R. 66-6, Offer Letter, p. 2) And Goldberg said that he had informed Kovacevic during her interview that he "operate[d] in constant informal reviews and feedback." (R. 63-26, Goldberg Dep. Page ID 397, p. 2)

In addition to the review process, the Handbook spelled out the terms for discipline:

The company may discipline or discharge an employee with or without cause and with or without notice. However, the company believes in the concept of progressive discipline in appropriate circumstances.

When the company elects progressive discipline, there will generally be a first and sometimes a second written warning.

(R. 66-5, Employee Handbook, PageID 611, p. 6) Even so, "[t]he company [could] impose greater or lesser discipline, based on its view of all the circumstances," (*id*.), and supervisors retained the option to provide reviews and feedback informally.

B.

According to AIF, Kovacevic struggled to learn her new role. In Goldberg's words, "[a]t nearly every check run, three times a week," she brought him a check with "some form of mistake necessitating voiding and reprinting of the related check." (R. 63-1, Goldberg Decl., PageID 284,

---

[1] The Handbook said that "[i]ndividual job performance . . . w[ould] be reviewed at thirty (30), sixty (60) ninety (90) days, 6 months of employment or at any time per Manager's discretion and annually thereafter." (R. 66-5, Employee Handbook, PageID 610, p. 5)

p. 3) Goldberg said that he "made sure that [Kovacevic] knew of the mistake and was corrected." (*Id.*) Still, Goldberg explained, during Kovacevic's employment AIF experienced a 952% increase in voided checks compared to previous years.

The problems didn't stop there. Goldberg said that Benton "expressed frustration" because Kovacevic continued to ask Benton to search for invoices or payment status—a duty within Kovacevic's purview. (*Id.* at PageID 285, p. 4) So Goldberg asked Benton to train Kovacevic on matching invoices with purchase orders. That training didn't get very far, because, according to Goldberg, "[Kovacevic] was either unable or unwilling to learn the task." (*Id.*) Because of Kovacevic's errors, vendors went unpaid and at least one vendor put AIF's account on hold.

Kovacevic's supervisors communicated their concerns to her. Goldberg told Kovacevic that because Benton was "going to be getting pulled in different directions," Kovacevic needed "to come to [Goldberg] if [she couldn't] find something so [he could] train [her] on how to search for it independently." (R. 63-6, Goldberg Email 03/25/2020, PageID 300, p.2) This served the company's goal of "solv[ing] our questions ourselves and keep[ing] interruptions to other departments to a minimum." (*Id.*) He reminded her to file payment records after each check run, because her failure to do so was "causing some issues" for other employees needing access to records. (63-9, Goldberg Email 03/30/2020, PageID.308, p. 2)

By July, Goldberg's "gut" told him that he likely would have to terminate Kovacevic. (R. 68-2, Goldberg Dep., PageID 690, p. 74) But at that time he still hoped that he could "work with her to try to see if [he] could salvage [her employment]." (*Id.*) By mid-August, he met with Barber. Goldberg informed Barber that Kovacevic's "work mistakes were not getting better and it was at the point that [Goldberg] believed [he] needed to find a replacement." (*Id.* at PageID 689, p. 73)

3

From August to October, Kovacevic continued to make accounting errors. First, she sent Goldberg more than $260,000 in bills that were not yet due. Goldberg emailed Kovacevic to explain that if he had signed the checks, AIF would have had a considerable amount of money coming out of its bank account early. (R. 63-12, Goldberg Email, 08/31/2020, PageID 315, p. 2) And such a payment would have had damaging "financial implications." (*Id.*) He said that these kinds of mistakes couldn't "continue to happen." (*Id.*) Then, Kovacevic sent Goldberg another check—this time with the wrong amount to pay vendors. (R. 63-14, Goldberg Email, 10/13/2020, PageID 319, p. 2) Goldberg explained that Kovacevic's errors risked leaving the company's financial reserves depleted. (*Id.*)

From Kovacevic's perspective, she admits that she made mistakes—but not "that many"— and Goldberg's emails only addressed "[l]ittle things." (R. 66-1, Kovacevic Dep., PageID 576, pp. 68–70) And when Goldberg voided checks, she says that sometimes it wasn't her fault or Goldberg didn't explain why he was doing so. She also said that at least some of the errors related to AIF's accounts payable predated her employment. And she said that Barber once told her that she "was the best employee [AIF] had, because [she] was always so happy at work." (R. 66-2, Kovacevic Aff., PageID 581, p. 3)

Even if Barber thought Kovacevic was happy at work, he created a confidential online job posting for Kovacevic's position in late October. He reached out to at least three applicants within a week of the posting. And by November 10, he scheduled an interview with at least one candidate.

C.

On November 15, Kovacevic was unusually cold at home, and Michele told her to take a COVID test. Kovacevic received a positive test result on November 19. AIF told her to "stay

4

home until [she felt] better after the 14 days that the [Michigan Governor] had announced." (R. 66-1, Kovacevic Dep., PageID 572, p. 53).

While Kovacevic was on leave, Goldberg took over her duties. And he found more problems: 1) "97 blank checks that were not used in sequence, hidden, and forgotten about"; (2) "[o]ver 70 past due bills . . . between two and five months [old]"; (3) "[o]ver 20 vendor credits totaling more than $100,000 . . . that were not processed and applied to vendor payments;" and (4) an "Accounts Payable file cabinet of approximately $2.5 million of active bills [that] were not organized and alphabetized." (R. 63-1, Goldberg Dec., PageID 287, p. 6) Citing both "[t]hese newly discovered issues" and Kovacevic's "ongoing weak performance, continuous errors, and lack of attention to detail," Goldberg "decide[d] that [AIF] needed to end her employment immediately instead of waiting for a replacement." (*Id.*).

On November 24, Kovacevic called AIF to see when she could return to work. Kovacevic said that she was initially told to wait until she felt better, at least until after Thanksgiving. When Kovacevic later pressed for a return plan, Barber told her that the company "[had] to see what [it was going to] do with employees that had COVID." (R. 66-1, Kovacevic Dep., PageID 572, p. 54)

Kovacevic said that after this conversation with Barber, Goldberg called her and informed her that it was better for them to "go separate ways." (*Id.* at PageID 573, p. 55) Kovacevic replied that Goldberg couldn't "fire [her] because [she had] COVID." According to Kovacevic, Goldberg did not confirm the reason for firing her. He just reiterated, "[I]t's better for us to separate at this point." (*Id.*)

5

Following Goldberg's call with Kovacevic, Tom Michele emailed Barber a list of various "performance issues" that he had observed or heard about. (R. 66-12, Michele Email 11/24/2020, PageID 637, p. 2) Barber emailed Goldberg documenting their conversation and providing a timeline of Kovacevic's performance issues. Barber then sent Kovacevic a letter to "confirm our discussion today that effective immediately on this day, Monday, November 23rd, 2020, [Kovacevic's] employment with American International Foods, Inc. is terminated due to performance not meeting [the company's] standards." (R. 66-11, Kovacevic Termination Letter, PageID 635, p. 3) The letter was dated November 24, the date that the conversation in fact occurred.

## D.

Kovacevic filed a complaint alleging violations of EPSLA, which was enacted as part of the Families First Coronavirus Response Act. The gravamen of her complaint was that AIF retaliated against her for taking leave.

AIF moved to dismiss Kovacevic's case for failure to state a claim. Kovacevic amended her complaint, adding a claim that AIF violated the Michigan COVID-19 Employment Rights Act of 2020. And AIF again moved to dismiss. When the district court granted the motion to dismiss in part and denied in part, Kovacevic filed a second amended complaint. Then AIF moved for and was granted summary judgment. The district court found that while Kovacevic made a prima facie case for retaliation, AIF provided a legitimate, nonretaliatory reason for taking an adverse employment action against her, and she failed to show that this reason was pretextual. Because it dismissed Kovacevic's federal claim, the district court declined to exercise supplemental jurisdiction over her state-law claim. Kovacevic timely appealed.

**II.**

We review a grant of summary judgment de novo. *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir. 2001). We affirm only if, viewing "all evidence in the light most favorable to the nonmoving party," "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Cincinnati Ins. v. Zen Design Grp., Ltd.*, 329 F.3d 546, 552 (6th Cir. 2003). A dispute over a material fact is genuine only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We draw all reasonable inferences in favor of the nonmoving party and do not determine credibility or weigh evidence. *Id.* at 255.

**III.**

**A.**

Kovacevic's claim of retaliation falls under EPSLA. EPSLA was a temporary law which required employers to provide up to 80 hours of paid sick leave to employees who could not work as a result of COVID-19.[2] 29 U.S.C. § 5102(b)(2)(A). And employers were prohibited from "discharg[ing], disciplin[ing], or in any other manner discriminat[ing] against" employees who took leave under EPSLA. *Id.* § 5104(a)(1).

The legal framework for considering retaliation claims brought under the EPSLA is a matter of first impression for this court. Enforcement of EPSLA claims falls under the provisions of the Fair Labor Standards Act ("FLSA"). *Id.* § 5105(a)(1). And we use the *McDonnell Douglas* framework to evaluate FLSA claims involving indirect evidence of retaliation. *See Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006); *see also McDonnell Douglas Corp. v.*

_____

[2] EPSLA expired by its own terms on December 31, 2020. 29 U.S.C. § 5109.

*Green*, 411 U.S. 792, 802–04 (1973); *Jackson v. Genesee Cnty Rd. Comm'n*, 999 F.3d 333, 349 (6th Cir. 2021). So we find that the *McDonnell Douglas* framework is appropriate in the EPSLA context. Under this framework, the "[p]laintiff bears the initial burden to establish a *prima facie* case of retaliation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If the plaintiff succeeds, "the burden [of production of evidence] shifts to the [employer] to articulate a legitimate, nonretaliatory reason for the adverse action." *Kirkland v. City of Maryville,* 54 F.4th 901, 910 (6th Cir. 2022). If the defendant provides such a reason, "the burden shifts back to Plaintiff to demonstrate that Defendants' proffered reason was not the true reason for the employment decision." *Laster*, 746 F.3d at 730. (cleaned up). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citation omitted).

AIF contends that Kovacevic has failed to make out a prima facie case of retaliation. But because AIF presents legitimate reasons for firing Kovacevic, as we'll explain, we will proceed to pretext without determining whether Kovacevic made out a prima facie case.

B.

AIF must show a legitimate, nonretaliatory reason for firing Kovacevic in order to prevail at summary judgment. *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 526 (6th Cir. 2008) (citation omitted). And it does.

AIF claims that it fired Kovacevic for poor performance and points to her serious errors that risked the company's financial stability. As an accounts-payable specialist, Kovacevic failed to learn the company's invoice system. She wrote checks on bills that were not yet due. She failed to pay vendors. And she left the company's finances in disarray.

8

AIF also explains why it fired Kovacevic while she was on COVID leave. Goldberg took over Kovacevic's work while she was on leave. That's when he discovered more of Kovacevic's errors. These errors—not Kovacevic's leave of absence—convinced Goldberg to terminate her immediately, Goldberg says.

And that reason—Kovacevic's poor performance—is a nonretaliatory reason for termination. *See Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment . . . under the *McDonnell Douglas*[] framework.").[3]

## C.

AIF gave a nonretaliatory reason for firing Kovacevic, so she must show by the preponderance of the evidence that this reason was pretextual—that is, that AIF's "proffered reasons [for terminating her] were factually untrue." *Lindsay v. Yates*, 578 F.3d 407, 421, 422 (6th Cir. 2009) (citation omitted); *see also Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Plaintiffs typically do this in one of three ways. They show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)

---

[3] Kovacevic argues that the district court erred in considering Goldberg's declaration. She objects that, because the declaration was submitted after his deposition, she did not have the opportunity to question Goldberg about it. But Kovacevic did not object to the declaration before the district court. "If a party fails to raise an issue to the district court, then that party 'forfeits the right to have the argument addressed on appeal.'" *Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012) (citation omitted). AIF attached Goldberg's declaration to its motion for summary judgment. Kovacevic had the opportunity to raise this issue before the district court and did not. So Kovacevic's newfound objection to the declaration is forfeited.

Kovacevic relies on the second way: she says that the proffered reasons didn't motivate her discharge.[4]  So she must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Abdulnour v. Campbell Soup Supply Co.,* 502 F.3d 496, 503 (6th Cir. 2007) (citation omitted).  She offers three arguments:  (1) the timing of her termination establishes pretext; (2) AIF fabricated its reasons for firing her and changed its justifications during litigation; and (3) her offer letter and the Employee Handbook show that AIF failed to follow its own termination policies. We take each argument in turn.

First, Kovacevic argues that the timing of her termination establishes pretext.  She took COVID leave.  She was fired while on that leave.  And because of this timing, she says she doesn't need other evidence of motive.  Not so.  True, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citation omitted)).  True, temporal proximity alone may provide "evidence of a causal connection for the purposes of satisfying a *prima facie case* of retaliation," *Mickey*, 516 F.3d at 525 (emphasis added).  But that is not the issue here.  And "temporal proximity cannot be the sole basis for finding *pretext*." *Seeger*, 681 F.3d at 285 (emphasis added) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)).

And no reasonable juror would find the timing of Kovacevic's termination suspicious. Kovacevic made significant accounting errors—some discovered prior to her COVID leave and some during.  Goldberg thought he would have to fire Kovacevic months before she took leave

---

[4] Kovacevic acknowledges that she made mistakes but claims they could not motivate her discharge.  But "[a]n employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 802 (6th Cir. 2007).

and had posted a job opening online prior to her taking COVID leave. The errors he discovered while she was on leave merely confirmed that inclination. Kovacevic has presented no evidence to call this explanation into question.

Second, Kovacevic argues that AIF changed justifications for firing her throughout the litigation and fabricated reasons to fire her.[5] Kovacevic says that AIF initially told her that her COVID leave had prompted the need to discuss when she would return to work. She was fired shortly after. Kovacevic says that AIF fired her for taking COVID leave—and only came up with the poor work performance rationale after the fact.

But even Kovacevic's own deposition doesn't back up the view that AIF changed its reason for firing her. Her main evidence on this point is that before she got fired Barber told her that he "[had] to see what [they were going to] do with employees that had COVID." (R. 66-1, Kovacevic Dep., PageID 572, p. 54) And Kovacevic points to a single statement Barber made praising her positive disposition as evidence that the real reason for her termination was her COVID leave, not her poor work performance.

True, "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.), *opinion amended on other grounds on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996). And when an employer expresses disapproval of an employee's work performance only after the firing, there can be a genuine dispute of material fact about whether the employer's reason for terminating the employee was pretextual. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 591–92 (6th Cir. 2002).

---

[5] Kovacevic argues that AIF fabricated complaints against her and backdated her termination letter to support an inference that AIF planned to fire her before the November 24 call. She forfeited these arguments by not raising them below.

But no reasonable juror would conclude that Barber's reference to bringing employees back after COVID leave was a reason *at all* for firing Kovacevic. That statement reflected only AIF's policy in welcoming any employee back to work after a COVID leave of absence. And AIF regularly welcomed back employees who had gotten COVID. Indeed, ten other employees of AIF took COVID leave in 2020, but none were fired. The fact that all other COVID-positive employees were able to return to work at AIF provides further evidence that Barber was not articulating a policy of terminating employees who took COVID leave.

As to Barber's comment that Kovacevic was a happy employee, Barber was not Kovacevic's superior, and he was not responsible for evaluating her job performance. Goldberg, who did evaluate her performance, regularly criticized her organization and handling of company finances over the span of months. So in the face of the persistent and well documented errors Kovacevic made throughout her employment, she can't succeed in showing that AIF changed its reasons over time.

Nor can she show that Goldberg's discoveries during her absence were fabricated justifications for terminating her. Kovacevic's evidence of fabrication is that Goldberg did not document each incident or mention these issues to Barber before she took COVID leave. Based on this, Kovacevic argues that a reasonable jury could have found that Goldberg merely claimed to find evidence of poor performance while filling in for her in order to justify firing her for taking COVID leave.

Kovacevic's argument fails here. Goldberg's emails to Kovacevic addressing her errors throughout her employment are contemporaneous documentation of her poor work performance. And even if Goldberg had not emailed Kovacevic on each of these occasions, failure to document contemporaneously does not necessarily give rise to an inference of pretext. *See Abdulnour*,

502 F.3d at 503 (explaining that affidavits "drafted after the incident [can] be considered in support of a motion for summary judgment," even when "supervisors did not make contemporaneous records of [] alleged poor performance"). Kovacevic has provided no more than hypothetical alternative explanations for her termination. But "mere conjecture that the employer's explanation is a pretext" will not save a complaint on summary judgment. *Lindsay*, 578 F.3d at 421 (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002)). Kovacevic must produce evidence that AIF's reasons for terminating her—reasons she says were fabricated—were "factually untrue." *Id.* (citation omitted). She has not done so.

Third, Kovacevic points to AIF's alleged failure to follow the terms of AIF's Employee Handbook and her offer letter as evidence of pretext. She alleges that AIF failed to follow the procedure for progressive discipline outlined in the Handbook because Goldberg never explicitly referred to his criticisms of her work as "warnings." True, where an employee handbook establishes a general practice of counseling employees before terminating them, a company's failure to follow that practice may be evidence of pretext.[6] *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394–95 (6th Cir. 2005).

But here, the Employee Handbook makes clear that progressive discipline is an option that may be exercised at AIF's discretion. Unlike the Handbook in *DeBoer*, which stated that the company would generally counsel its employees before terminating them, *id.* at 389, 394, AIF's Handbook stated that the company may use "progressive discipline *in appropriate circumstances*" and will generally issue written warnings only "[w]hen the company *elects* progressive discipline."

---

[6] A "failure to *uniformly* apply a progressive discipline policy can be evidence of pretext." *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255 (6th Cir. 2023). But Kovacevic has not tried to show that similarly situated employees who engaged in "substantially identical conduct" received progressive discipline. *Id.* (citation omitted).

(R. 66-5, Employee Handbook, PageID.611, p. 6 (emphasis added)) In any event, Goldberg repeatedly brought his concerns with Kovacevic's work performance to her attention, remarking on at least one occasion that her "errors" could not "continue to happen." (R. 63-12, Goldberg Email, 08/31/2020, PageID 315, p. 2) So the fact that Goldberg did not formally tell Kovacevic that he was warning her within the terms of the company's progressive discipline policy simply does not demonstrate pretext.

Kovacevic also faults AIF for failing to provide scheduled performance reviews. The Handbook states that "[a]ll new employees will be reviewed at thirty (30), sixty (60) ninety (90) days, 6 months of employment *or* at any time per Manager's discretion and annually thereafter." (R. 66-5, Employee Handbook, PageID 610, p. 5 (emphasis added)) And Kovacevic's offer letter said that she would "be expected to be involved in a 30, 60, 90 day, 6 month, and annual reviews." (R. 66-6, Offer Letter, PageID.614, p. 2) AIF argues that the disjunctive "or" in the Handbook provision means the review process was discretionary. Kovacevic argues that the language in her offer letter combined with the Handbook terms gave her a reasonable expectation of performance reviews and the opportunity to correct errors.

This claim fails for the same reason her progressive-discipline claim fails. True, an "employer's failure to follow a policy that is related to termination or demotion can constitute relevant evidence of pretext," *DeBoer*, 124 F. App'x at 394 (citing *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 421–22 (6th Cir. 1999)). But even if AIF did not strictly follow its review policies, Kovacevic was certainly on notice that her performance was causing issues and had the opportunity to correct those problems. Goldberg regularly notified Kovacevic of problems with her performance, both via email and in person. And she still did not adjust her

work performance.  So Goldberg's efforts—accomplishing the corrective objective that an annual review would—combat any finding of pretext. Once again, Kovacevic's claim fails.

## IV.

Because Kovacevic failed to meet her burden at summary judgment of showing pretext, we affirm.